1  Robert S. Green (State Bar No. 136183)
2  **GREEN WELLING, P.C.**
   595 Market Street, Suite 2750
3  San Francisco, CA 94105
   Telephone: (415) 477-6700
4  Facsimile: (415) 477-6710
   Email: CAND.USCOURTS@classcounsel.com
5

6  William B. Federman
   **FEDERMAN & SHERWOOD**
7  10205 N. Pennsylvania Avenue
   Oklahoma City, OK 73120
8  Telephone: (405) 235-1560
   Facsimile: (405) 239-2112
9

10  Attorneys for Plaintiff,

11  JOSEPH STOPA, derivatively on behalf of
    Nominal Defendant, EQUINIX, INC
12

13            **UNITED STATES DISTRICT COURT**

14            **NORTHERN DISTRICT OF CALIFORNIA**

15

16  JOSEPH STOPA, derivatively on        Case No.:     **2467**
    behalf of Nominal Defendant,
17  EQUINIX, INC.                        **VERIFIED SHAREHOLDER
                                         DERIVATIVE COMPLAINT**
18              Plaintiff,
                                         **DEMAND FOR JURY TRIAL**
19         vs.

20  STEVEN CLONTZ, GARY
21  HROMADKO, SCOTT KRIENS,
    WILLIAM LUBY, IRVING LYONS,
22  III, CHRISTOPHER PAISLEY,
    STEPHEN SMITH, PETER VAN
23  CAMP

24              Defendants.

25          and

26  EQUINIX, INC.

27              Nominal Defendant.
28

_____
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.    Plaintiff Joseph Stopa ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Equinix, Inc. ("Equinix" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and other misconduct from July 29, 2010 to the present (the "Relevant Period") that have caused substantial losses and other damages to the Company.

## THE PARTIES

2.    Plaintiff Joseph Stopa ("Plaintiff") is a citizen of the State of New Mexico. He is a current shareholder of Equinix and has continuously held Equinix stock at all relevant times.

3.    Nominal defendant Equinix is a Delaware corporation with its principal executive offices located at One Lagoon Drive, Fourth Floor, Redwood City, California, 94065.

4.    Defendant Steven Clontz ("Clontz") is a citizen of the State of Georgia. He has served as a director since April 2005. Clontz serves on the Audit Committee. Defendant Gary Hromadko ("Hromadko") is a citizen of the State of California. He has served as a director since July 2000. Hromadko serves on the Audit Committee.

5.    Defendant William Luby ("Luby") is a citizen of the State of Rhode Island. He has served as a director since April 2010. Luby previous served as chairman of the board of directors of Switch & Data Facilities Company, Inc., a public company prior to its acquisition by Equinix in 2010. Luby is a member of the Compensation Committee. Defendant Irving Lyons, III ("Lyons") is a citizen of the State of California. He has served as a director since February 2007. Lyons serves as Chairman of the Compensation Committee.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

6.     Defendant Christopher Paisley ("Paisley") is a citizen of the State of California. He has served as a director since July 2007 and is the Chairman of the Company's Audit Committee and a member of the Governance Committee.

7.     Defendant Stephen Smith ("Smith") is a citizen of the State of California. He has served as the Company's Chief Executive Officer ("CEO"), President and as a director since April 2007.

8.     Defendant Scott Kriens ("Kriens") is a citizen of the State of California. He has served as a director since July 2000.  Kriens is a member of the Compensation Committee.

9.     Defendant Peter Van Camp ("Van Camp") is a citizen of the State of California. He has served as the Company's Executive Chairman since April 2007.   Prior to becoming Executive Chairman, Van Camp served as the Company's CEO and as a director since May 2000 and as President since March 2006. Van Camp is currently the Chairman of the Governance Committee.

10.     Collectively, Defendants Clontz, Hromadko, Kriens, Luby, Lyons, Paisley, Smith and Van Camp shall be referred to herein as "Defendants"  or "Individual Defendants."

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

12.     This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

13.     Venue is proper in this district pursuant to 28 U.S.C.  §1391(a) because a substantial portion of the transactions and wrongs complained of herein occurred in this district.    Further, Individual Defendants either reside or participated in board of director meetings or maintain executive offices in this

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

District and have received substantial compensation in this District by engaging in numerous activities and conducting business in this District.   Further, Equinix maintains its principal place of business in this District.

## DEFENDANTS' DUTIES

14.   By reason of their positions as officers, directors, and/or fiduciaries of Equinix and because of their ability to control the business and corporate affairs of Equinix, Defendants owed Equinix and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Equinix in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Equinix and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.   Each director and officer of the Company owes to Equinix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

15.   Defendants, because of their positions of control and authority as directors and/or officers of Equinix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Equinix, each of the Defendants had knowledge of material non-public information regarding the Company.

16.   To discharge their duties, the officers and directors of Equinix were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of Equinix were required to, among other things:

3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

2.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

3.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## BACKGROUND

17.     Equinix is a global network-neutral provider of data centers and Internet exchanges. Equinix offers the following data center services: colocation, interconnection and managed IT infrastructure services. Equinix derives the majority of its revenue from the colocation of product and services offered in its Internet Business Exchange data centers. Equinix further provides interconnection services to its customers, which enables them to connect more efficiently and effectively to their networks, their bandwidth service providers or even other Equinix customers.

18.     Colocation centers are shared data centers that are highly secure, reliable and fault-tolerant facilities. A company may decide to maintain its mission-critical equipment, such as its servers, off-site within a third-party facility instead of maintaining its networking and service equipment on its own premises. A company will lease a "cabinet" or "cage" in a colocation center.

19.     The majority of Equinix's revenue, over 95% of it, is from charging customers on a fixed and recurring basis each month for the duration of the contract, which is typically one to three years. Non-recurring revenue is composed of installation and professional services related to the customer's initial deployment. For example, cabinet rentals have a one-time installation fee and thereafter have an ongoing recurring monthly charge.

4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

20.     Churn (*i.e.,* customer attrition) in the colocation industry is typically low given the incredible time and expense necessary for a company to relocate its equipment to a new data center. Moreover, customer retention is essential due to the high costs associated with winning new clients — closing a new sale can sometimes take a full year. Historically, Equinix's churn has been low, in the 2% range.

21.     Equinix utilized a demand fulfillment business model over a demand creation model in the sales and marketing of its products and services. A demand fulfillment model is a business model where a company will simply offer a good product or service and take anyone who wants its products or services. A demand creation business model is more complex. It involves a company focusing on specific customers and their specific operations. The company will attempt to cross-sell its current products or services to its customers or even design new products or services to fulfill a specific customer's needs. This type of model requires new and different sales skills, approaches and processes. Demand fulfillment is more of a reactive selling strategy whereas demand creation is more of a proactive strategy and, as a result, demand fulfillment is a less costly model for a company to implement and maintain. When demand for a company's products is robust and growing, demand fulfillment is a very simplified and cost-effective business model.

22.     In April 2010, the Company acquired Switch & Data for $700 million in a cash and stock transaction. The deal, first announced in October 2009, was initially scheduled to close in the first quarter of 2010. Nonetheless, due to an extensive review by the Antitrust Division of the DOJ, the closing of the acquisition was postponed until the second quarter of 2010. As a result of lengthy delays in the DOJ review process, the Switch & Data sales force was forced to curtail dialogue with certain customers, leading to delays in closing sales. As a

result, booking trends at Switch & Data fell off dramatically beginning in December 2009 and continuing through July 2010.

23.    The decline in booking trends at Switch & Data was further exacerbated after the close of the deal due to Equinix's aggressive synergy plans. In the context of a merger or acquisition, synergy is the idea that the value and performance of two companies on a combined basis will be greater than the sum of the companies operating on an individual basis. Types of synergies recognized in a merger may be cost synergies (*i.e.,* savings through economies of scale) or sales synergies (*i.e.,* better reach through a larger sales force or expanded customer base or cross-selling of products). In terms of sales synergies, Equinix's synergy plans involved the elimination of the majority of the Switch & Data legacy sales force immediately upon the closing of the merger. This plan presented challenges for Equinix's legacy sales force as they were not trained or sufficiently familiar with selling into Switch & Data colocation centers, and while Switch & Data and Equinix were both data center providers, there were significant differences between the companies and their customer bases. Equinix was a high-cost, high-quality data center provider focused on large key Internet markets, whereas Switch & Data was a lower cost, lower quality provider focused on secondary markets.

## DEFENDANTS' CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING STATEMENTS

24.    On July 28, 2010, Defendants caused Equinix to issue a press release announcing its second quarter 2010 financial results. The Company reported a net loss of ($2.3) million, or ($0.05) diluted earnings per share ("EPS"), and revenue of $296.1 million, which included $37.6 million in revenues from Switch & Data for the quarter. Additionally, the Company reported revenue guidance of $335 to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

$338 million for the third quarter of 2010 and guidance of $1,225.0 million to $1,235.0 for the full year 2010. The press release stated in relevant part:

> Equinix saw strong Q2 financial results in all three of its operating regions and is on target to meet 2010 objectives," said Steve Smith, CEO and President of Equinix. "The integration of Switch and Data is ahead of schedule, and our expansions are providing us much needed capacity in many of our key markets, which positions us well for further growth.

25.     After releasing its financial results on July 28, 2010, Equinix hosted a conference call announcing its second quarter 2010 results with investors, media representatives and analysts, during which defendants represented the following:

> [SMITH:] I'm pleased to announce that Equinix delivered another quarter of strong financial results with revenues coming in on target and adjusted EBITDA coming in above expectations. Importantly, both results were able to absorb the currency headwinds we experienced throughout the quarter. *This is our thirtieth consecutive quarter of revenue and adjusted EBITDA growth and a strong proof point of the exceptional visibility we have into this-- our financial model and the track record of strong execution.*
>
> *Highlights of the quarter include record gross bookings in all three regions as we expected with the scaling of our growth plan in 2010 with the highest ever outbound bookings for US-based multinationals deploying critical infrastructure into both Europe and Asia, demonstrating the strength of our global services delivery platform.* We also had strong interconnection growth across all three regions with a significant pickup in cross connects, exchange ports and traffic on our switches.
>
> *        *        *
>
> I'd like to review our progress with the Switch and Data integration. As I mentioned earlier we are ahead of schedule and have been able to accelerate the timing to realize the initial cost synergies for 2010. Overall the integration is proceeding very well with key milestones in place and a final objective to have full quote to cash integration completed by Q2 2011. *First let me say that the cultural [limit] between our employees has been a bright spot in the integration. In particular we've been impressed with the operational excellence and customer focus across the Switch and Data team. We've obviously had to make some tough decisions in achieving our synergy targets, yet we're bringing a very strong team into the Equinix fold.* We are on track to achieve the $20 million cost synergies previously outlined and have moved aggressively towards this goal. . . .

7

*Shifting gears to revenue synergies, we've established a strong foundation for driving revenue across the integrated platform.* We've had early success with 12 cross entity deals and also saw orders for new cabinets and interconnection services across 29 of the 34 former Switch and Data sites. We're also seeing the number of deals in the pipeline increase monthly with activities starting to show up in Atlanta, Bergen County, Dallas, New York City, Seattle, Silicon Valley and Toronto. Additionally, we see early signs of cross regional deal flow from Switch and Data's customers expressing interest in our global platform in both Europe and Asia. *The sales organizations have been completely integrated with full cost synergies already achieved in the sales function. So we now have the sales teams focused on revenue synergies by driving bookings and growing key accounts.* Overall customer feedback has been positive in particular with networks, strategic accounts and the electronic trading venues many of which see the benefits of dealing with a single global provider.

\*     \*     \*

*Jonathan Atkin — RBC Capital Markets — Analyst*
. . . I'm wondering how you might characterize the competitive environment in terms of pricing behavior by your peers and particularly in markets or regions where there's a lot of supply coming online? ...

. . . [SMITH:] On the competitive front it does vary by metro, by market. I would tell you in the US the statement you made is we're seeing a little bit of that in the LA market. And I think because of the demand - or the competitive supply that we see in Phoenix and Vegas and also in the LA market, *so there are certain markets where certain pressure - pricing pressure and pricing behaviors are going to change, but that's not terribly different than what we've experienced over several quarters.* And so in certain markets we're going to get some pricing pressure on certain deals. If it's a strategic deal and it's a magnetic deal for us, we'll get more aggressive. If it's not, we're going to let it go and whether it goes to a competitive retail or a wholesale business, so be it. *We're maintaining the discipline on the floors and ceilings we have on our pricing and the sales force is staying very, very disciplined on price.* So I wouldn't tell you it's in very many markets, it's in a couple of places and on a couple of deals where we're seeing this as you called it pricing behavior get a little goofy.

\*     \*     \*

*David Barden — BofA Merrill Lynch - Analyst*
. . . Would just be on the Switch and Data merger you guys have focused a lot on the cost synergies. There wasn't really a lot of talk about revenue synergies at the time. I was wondering if you guys could kind of maybe elaborate a little bit on if you've seen any cross-selling opportunity from one sales force to the other base and vice versa, and if there's something incremental that could be extracted from that aspect of the merger? Thanks.

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

[TAYLOR:] Well as I mentioned earlier, David, *we are completely focused now on the revenue synergies in terms of the sales force.* So in terms of quantifying revenue synergies right now, way too early. We do have cross deal flow in the pipeline. *We've got deal flow from Switch and Data's customers now looking into Asia and Europe. We've got the sales forces cross-selling into both assets. They're all part of one team today, the organization is completely finished in sales, so the structure all the way up to the sales leader in North America has been in place for weeks now.* So I would tell you that it's all hands down right now to get absolutely focused on these 50 whatever four or five assets we have in the North America region with the combined sales force. So generally we're [sic] call it almost 2X feet on the street in North America now with the combined Switch and Data and growth of the organic Equinix sales force, so we have high expectations of this team to continue to sell into all the assets and we'll expect that we'll start to attack that utilization level that we picked up with Switch and Data.

(Emphasis added.)

26.    On this news, Equinix's stock closed up $5.76 per share to close at $93.82 per share on July 29, 2010.

27.    Then on October 5, 2010, Defendants caused Equinix to issue a press release announcing revised third quarter and fiscal year 2010 guidance. The Company reported it expected revenue to be in the range of $328.0 to $330.0 million for the third quarter of 2010. The Company further reported it expected revenues for the full year 2010 to be approximately $1,215.0 million, 1.2% lower than the midpoint of its previous outlook. The press release stated in relevant part:

This updated guidance is due to underestimated churn assumptions in Equinix's forecast models in North America, greater than expected discounting to secure longer term contract renewals and lower than expected revenues attributable to the Switch and Data business acquired in April 2010.

28.    After releasing its revised financial guidance on October 5, 2010, Equinix hosted a conference call during which the Company announced it would transition from a demand fulfillment business model to a demand creation model.

29.    On this news, Equinix's stock plummeted $34.75 per share to close at $70.34 per share on October 6, 2010.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

30.     Equinix's warnings triggered a sharp selloff in the data center sector on October 6, 2010. In response, SAVVIS Inc., one of Equinix's competitors, issued a press release on that day reaffirming its own guidance for the year.

31.     In addition, on October 6, 2010, Morgan Joseph issued an analyst report that stated in part:

> The movement in the numbers is not overly concerning to us; however, management's tone was less optimistic than on previous calls. *The emphasis on shifting to a demand creation business from a demand fulfillment business was a change from previous calls emphasizing robust demand and continued market expansions to increase capacity and meet demand.*

32.     The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period, were as follows:

a)     Booking trends at Switch & Data fell off dramatically during the DOJ review process. Beginning in December 2009, bookings at Switch & Data significantly weakened over previous levels, bottoming out in July 2010. The weak Switch & Data bookings were exacerbated by the Company's aggressive synergy plan, which eliminated the majority of Switch & Data's legacy sales force immediately upon completion of the merger.

b)     Demand for the Company's colocation services was not as robust as previously disclosed, and as a result of the changing outlook in demand, the Company would be transitioning from a demand fulfillment business model to a demand creation model.

c)     Intensified competition was placing significant pressure on the Company's churn and renewal rates. Equinix's churn rate jumped to 2.9% in the third quarter 2010, well above its historical average of 2%. The intensified competition was further causing pricing instability in the colocation market, as the Company was forced to

10

give price concessions in order to secure certain long-term contract renewals.

d) The Company's forecasting model failed to take into account booking trends at the newly acquired Switch & Data, and increased churn rates and pricing pressures in the colocation market. Moreover, given the increased competitive pressures and the changing landscape in the industry, the Company had no reasonable basis to make projections about its revenue growth.

33. As a result of the false statements Defendants have breached their fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

34. Plaintiff brings this action derivatively in the right and for the benefit of Equinix to redress injuries suffered and to be suffered by Equinix as a result of the breaches of fiduciary duty by the Individual Defendants.

35. Plaintiff will adequately and fairly represent the interests of Equinix and its shareholders in enforcing and prosecuting its rights.

36. As a result of the facts set forth herein, Plaintiff has not made a demand on Equinix's Board of Directors to institute this action against the Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

37. The Defendant Directors face a substantial likelihood of liability in this action because they caused Equinix to issue false and misleading statements concerning Equinix's business practices, related transactions, internal controls, and omitted material information regarding Equinix's falsified financial results. These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that

11

1 situation, proximately causing millions of dollars of losses for Equinix as
2 Equinix's common stock traded at artificially inflated levels.

3     38.    Defendants who are currently the members of the Equinix board are
4 Defendants Van Camp, Clontz, Hromadko, Kriens, Luby, Lyons, Paisley and
5 Smith.

6 **The Members of the Board of Directors Lack Independence**

7     39.    The principal professional occupation of defendant Smith is his
8 employment with Equinix as its President and CEO, pursuant to which he has
9 received and continues to receive substantial monetary compensation and other
10 benefits. In 2010, Smith's total compensation was $5,456,312.00.    Thus,
11 defendant Smith lacks independence, rendering him incapable of impartially
12 considering a demand to commence and vigorously prosecute this action.

13     40.    In its Schedule 14A Proxy Statement filed with the SEC on April 28,
14 2011, Equinix states that Defendant Smith (CEO and President) and Defendant
15 Van Camp (Executive Chairman) are not independent directors under NASDAQ
16 listing standards.

17 **Likelihood of Substantial Liability of the Audit Committee Defendants**

18     41.    Clontz, Hromadko, and Paisley each serve on the Audit Committee of
19 Equinix's Board of Directors and sat on the Audit Committee during each of the
20 acts and omissions alleged herein. As such, they will take no action against one
21 another or the other members of the Board of Directors or the other Individual
22 Defendants because each member of this Committee breached important specific
23 duties as Audit Committee members.

24     42.    The Audit Committee's charter mandates that the Committee is
25 responsible for:

26     &bull;    Reviewing the Company's financial reporting processes and
        disclosure controls and processes;
27
28     &bull;    Reviewing the adequacy and effectiveness of the Company's internal
        control policies and procedures;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Reviewing the reports prepared by management, and attested to by the Company's independent auditors, assessing the adequacy and effectiveness of the Company's internal controls and procedures;

- Reviewing, before release, the audited financial statements and unaudited interim financial statements;

- Reviewing, before release, the Company's earnings announcements or financial releases and Management's Discussion and Analysis (MD&A) in the Company's annual report on Form 10-K and quarterly reports on Form 10-Q; and

- Overseeing compliance with the disclosure requirements of the SEC.

43. The Audit Committee was directly responsible for overseeing and directly participating in Equinix's financial reporting process. The Audit Committee members either knew or should have known of these financial misrepresentations given their size, scope, and blatancy, yet they failed to prevent or correct the false and misleading issuances. Such conduct is not protected by the business judgment rule.

44. As a result of the Audit Committee's failures, Defendants Clontz, Hromadko, and Paisley face a substantial likelihood of liability for breaches of fiduciary duties, making any demand upon them futile.

45. Defendant Paisley has also been classified by the Board as an Audit Committee "financial expert" as the term is defined in the SEC's rules and regulations. In light of this, Defendant Paisley faces an even greater likelihood of substantial liability as the manipulations and misrepresentations took place under his expert eyes. As a result, Defendant Paisley faces a substantial likelihood of liability for his breaches of fiduciary duties and any demand upon him would have been futile.

## Likelihood of Substantial Liability of the Compensation Committee Defendants

46. Director Defendants Luby, Lyons, and Kriens are further exposed to liability because of their participation on the Compensation Committee. In these positions they approved compensation and finance plans for senior executives.

---

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

47.     According to the Compensation Committee charter, the Compensation Committee had the responsibility to:

- Review and approve the corporate objectives that pertain to the determination of the compensation of the Company's CEO;

- Determine the CEO's salary and contingent compensation, based on an evaluation of his or her performance and other relevant criteria;

- Make recommendations to the Board regarding the compensation of members of the Board; and

- Approve the adoption or amendment of equity and cash incentive plans.

48.     Because each Director Defendant approves each other's cash compensation, each Director Defendant would not institute an action against the other Director Defendants, as it would jeopardize their personal compensation.

49.     The Compensation Committee members either knew or should have known of the financial misrepresentations described above, given their size, scope, and blatancy.  As a result, the members of the Compensation Committee face a sufficiently substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them would have been futile.

**Likelihood of Substantial Liability of the Governance Committee Members**

50.     Director Defendants Paisley and Van Camp are further exposed to liability because of their participation on the Governance Committee.

51.     Pursuant to the Company's Governance Committee charter, this committee is responsible for evaluating at least annually the performance of management, the Board and each Board committee against their duties and responsibilities relating to corporate governance.

52.     Defendants Paisley and Van Camp failed in their duties to develop appropriate governance measures to prevent the wrongdoing that occurred as alleged herein and any demand upon them would have been futile.

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Additional Likelihood of Substantial Liability of the Board of Directors**

53. Defendant Directors are also exposed to substantial potential liability in this action because of their complete failure to put or enforce appropriate financial and legal compliance controls in place to assure the accuracy of financial information disclosed by Equinix to the public. Members of the Board of Directors have had knowledge of the wrongdoing and did nothing to prevent it, to stop it, or to prosecute this action. They have ratified the wrongdoing alleged herein.

54. The Company's Code of Business Conduct applies to all directors officers and employees of Equinix. With regard to the Company's public filings, it states as follows:

> The U.S. federal securities laws require Equinix to disclose certain information in various reports that Equinix must file with or submit to the SEC. In addition, from time to time, Equinix makes other public communications, such as issuing press releases.

> Equinix expects all directors, officers and employees who are involved in the preparation of SEC reports or other public documents to ensure that the information disclosed in those documents is full, fair, accurate, timely and understandable.

> To the extent that you reasonably believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report those concerns in accordance with the procedures described in Sections 16 through 18 of the Code.

55. The Company's Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "CEO Code of Ethics") mandates that the CEO (Defendant Smith) and all senior financial officers:

> are responsible for full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission, and in other public communications made by the Company. Accordingly, the CEO and each senior financial officer must (a) promptly to bring to the attention of the Audit Committee of the Company's Board of Directors any material information of which he or she becomes aware that affects the disclosures made by the Company in its public filings and (b) otherwise assist the Audit Committee in fulfilling its responsibilities.

15

56.    Each and every Director Defendants executed a copy of the Code of Business Conduct acknowledging that they had received and reviewed them. Each and every Director Defendant breached the Code of Ethics, and in doing so, breached their fiduciary duties to the Company.

57.    Director Defendants reviewed, prepared and/or signed the materially false and misleading press releases and financial statements during the Relevant Period. Consequently, the Director Defendants are exposed to a high likelihood of substantial liability in this action, and are therefore, incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

58.    The Board of Equinix approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise these wrongs from Equinix shareholders or recklessly disregarded the wrongs complained herein, and is therefore not disinterested parties.   Each of the Individual Defendants exhibited a systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

59.    In order to bring this suit, the Board of Equinix would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

60.    The acts complained of constitute violations of the fiduciary duties owed by Equinix's officers and directors and these acts are incapable of ratification.

61.    Equinix has been, and will continue to be subjected to lawsuits for the actions described herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Equinix any part of the damages the Company has suffered and will continue to suffer.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

62.    The actions of the Directors and the relationships between and among the Individual Defendants as described above has impaired the Board's ability to validly exercise its business judgment and has rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

63.    Any suit by the directors of Equinix to remedy these wrongs would likely expose the Individual Defendants and Equinix to further violations of securities laws which could result in additional civil actions being filed against one or more of the Board.   In light of this, they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

64.    Indeed, Equinix has already expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to:

    a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

    b)    Costs and legal fees for defending Equinix and certain of the Individual Defendants against private securities class action litigation arising from illegal and improper conduct alleged herein.

65.    Plaintiff has not made any demand on the shareholders of Equinix to institute this action since demand on the shareholders would be a futile endeavor for the following reasons:

    a)    Equinix is a publicly held company with approximately 348.15 million shares outstanding, and thousands of shareholders;

    b)    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

c)   Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION**

66.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

67.   As alleged in detail herein, each of the Defendants (and particularly Defendants who were members of the Audit Committee) had a duty to ensure that Equinix disseminated accurate, truthful and complete information to its shareholders.

68.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Equinix shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

69.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS**

70.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

71.   As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

18

72.     Defendants willfully ignored the obvious and pervasive problems with Equinix's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

73.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

74.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

75.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Equinix.

76.     Plaintiff, as a shareholder and representative of Equinix, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Equinix, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Equinix to misrepresent material facts regarding its financial position and business prospects.

79.     As a direct and proximate result of Defendants' abuse of control, Equinix has sustained significant damages.

80.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

81.     Plaintiff, on behalf of Equinix, has no adequate remedy at law.

## COUNT V

## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

82.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

83.     Defendants had a duty to Equinix and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Equinix.

84.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Equinix in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Equinix's affairs and in the use and preservation of Equinix's assets.

85.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Equinix to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Equinix, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged Equinix.

## COUNT VI

## AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

87.   As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Equinix to incur (and Equinix may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

88.   As a result of this waste of corporate assets, Defendants are liable to the Company.

89.   Plaintiff, on behalf of Equinix, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.   Directing Equinix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.   Awarding to Equinix restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

DATED:  May 19, 2011                          **GREEN WELLING, P.C.**

By: _____
     Robert S. Green

**GREEN WELLING, P.C.**
595 Market Street, Suite 2750
San Francisco, CA 94105
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Joseph Stopa declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Equinix, Inc. (NASDAQ: EQIX), and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Equinix, Inc. common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

May 16, 2011
Date

(Signature of Investor)

C:\Users\ADB\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\00TAQXEK\VerificationStopa (2).docx